Our fourth and final case, 23-1581 Balogh v. Commonwealth of Virginia. Mr. Kelly, whenever you're ready, sir. May it please the Court. Fairness C. Kelly, Goshen, New York. Thank you, Your Honor, for granting oral argument. The facts of this case do not show that at some point around 11 o'clock in the morning of the Unite the Right rally, Chief Thomas was confronted with a chaotic scene that he didn't know how to deal with and made a judgment call. And we cannot use an abuse of Rule 12 to mask a fundamental assault on the First Amendment. And I suggest that is what has gone on in the district court and that is what appellees want you to confidence today. The facts of this case rather show that appellees held ideological alliances with criminal anarchists intent on thwarting the First Amendment rights of Balogh and others like him to engage in dissident speech at Charlottesville. The facts of this case show that there was a predetermined plan to let violence fester and explode to such a point that they could call for a declaration of an unlawful assembly. And that would get them to the very point they wanted to get and they failed to get before Judge Conrad. The facts of this case show that violence did explode and the intelligence that Chief Thomas had prior to the event indicated that his side in the street battle that would occur held a two to one advantage over Balogh and people similarly situated. If this is not a gross violation of the First Amendment, then nothing is. And I could find no case, nor have appellees cited any case, where in the interest of preserving public safety, the local authorities remove a speaker, not from a hostile crowd, but into the maw of a hostile crowd. This is a case crying out for redress and we ask you to grant it now. Mr. Kelly, when you talk about the facts, this case was dismissed at a 12B6 stage, right? Correct. Okay. And so, but what's odd about this case is that in addition to the complaint, I think both sides stipulated to the admission of the so-called HEFI report. Is that fair? That's fair. Okay. That's correct. So we've got a bunch of facts that we would typically not have otherwise as a result of the report. And included in the report, as I understand it, is the fact that the author of the report concluded that this was a case of mutual combat, not one that was predicated on an innocent speaker being overwhelmed by otherwise combative and unlawful protests. And if that fact is accurate and part of the report, then doesn't that kind of torpedo your case? Not at all, Your Honor. Mutual combat in what context? I mean, I just, that's what- Mutual context where lawful speakers and men who came to hear them knew they would be assaulted by the vile missiles of the Antifa. And I won't get too scatological here, but if you knew that in order to go and defend the Lee statute, there would be miscreants coming with cement cans and other things that are even less palatable to assault you, wouldn't you be prepared for combat? Well, you have two options, I suppose. You could be prepared for combat or withdraw, but having been prepared for combat, at that point the law says that, you know, the First Amendment protections don't otherwise apply. Where? I'm aware of no such case. Well, I'm asking you that. I'm aware of no such case where the law says that if you're going to be assaulted by cement cans- speaker who's being overwhelmed by a violent mob. And even taking your analysis that we have a violent mob on the other side, we've got an equally violent mob on the other side. Not an equally violent mob. That's what the report says. Not an equally violent mob. That's not what the HEAF report says. Tell me what it says. Go ahead. The HEAF report makes clear that the violence is going to be coming primarily from Appelli's ideological allies, just as it did at the Klan rally a month before. It doesn't say that. It says that- I'll tell you what it says. Joint appendix 177, page 70 of the HEAF report. Violence is going to be coming primarily from the Antifa and the anarchist criminals allied with them. Okay. That's where it's coming. And that intelligence proves to be thorough and accurate. That assessment is made later on in the HEAF report. See, one thing we can't do is imitate the example of Judge Moon and ignore the first 120 pages of the HEAF report. Ignore page 98 where there's a predetermined plan for where the violence will unfold. Ignore, for example, Sergeant Jones' statement around page 125 of the HEAF report saying, at approximately 1030 or even beforehand, the plan is to vent them all south onto Water Street. South of Market Street. Water Street's two blocks south of Market Street. You see that on page 100 of the HEAF report. The plan all the time is to wait for Market Street to explode and then put everyone out on there. And if it's true that you're letting society to devolve into a Hobbesian war of all against all, aren't all the cards held then by the people who want to thwart First Amendment rights? I submit they are. Is that something this court can confidence? I submit it's something this court cannot confidence. I understand there are cases that appellees would like to invoke, such as Turner v. Thomas or even the Pinder case. I do not believe they are opposite. And I do not believe they're opposite because Turner v. Thomas was not a First Amendment case. To the extent it's going to be incorporated into the First Amendment cases, it would stand to thwart classic jurisprudence like Hague v. CIO, like Edwards v. South Carolina, like Cox v. Louisiana. Let me ask you this. So do you concede that if the report or if there's any evidence in the record that some members of the initial protesters were engaged in combat and not in defensive combat, but engaged in attacks on counter protesters, even if some others were simply defending themselves, that that would, in effect, could lead a judge or a court to conclude that the parties effectively were engaged in mutual combat. And so the hecklers veto analysis would not apply. Do you agree with that? No, I do not agree with that. I do not agree with that for the following reasons. A, there is no evidence and there are no facts suggesting that Mr. Bailar was engaged in suppressing anyone's First Amendment rights or engaged in unlawful violence in any respect. And you would take each individual protester on his or her own actions? I would take the overall context, sir. And if the overall context shows, as it did at the Plano rally beforehand, that the pro-monument people are significantly outnumbered and the recipient of violence, that that is something that needs to be weighed in how the police respond. And furthermore, I wouldn't even say that the Heath report in itself has to come in in its entirety. It only has to come in on Rule 12 insofar as it's in favor of bailogue. So the answer to your question is no. The constitutional guarantee of liberty implies the existence of powers in society that are sworn to protect civil society. What do we do when those powers deliberately shirk that duty? Aren't we reduced to a Hobbesian war of all against all? I think that's what this case is about. And I think it is time that the Fourth Circuit addressed it forthrightly. Do you have anything else, Mr. Kelly? Well, I would like to just a few brief points and then I'll sit down if there are no questions for me. Page 98 of the Heath report, there's a flat statement. Rather than engage the crowd and prevent fights, the CPD plan was to declare the event unlawful and disperse the crowd. You, of course, need violence or the threat of imminent violence to declare an unlawful assembly. Page 125 of the Heath report, Sergeant Jones, there's a statement before 10 a.m. Now, the violence seems to really kick off and explode sometime around 1038, 1037, maybe around 1045. It's a little bit vague. But before 10 a.m., he states, Sergeant Jones, that's the plan. Just get everyone out of here and vent them onto Water Street. Water Street, of course, is two blocks south of Leap Park. Leap Park, Market Street, Main, and then Water Street. There's also the statement of Diane Hushon, H-U-E-S-C-H-E-N. She was a facility employee who was supposed to be standing, I think, just south of Market Street. Page 127. She states that her superiors all along expected things to go south. This is not, these are not indications of a police power acting in good faith. This is a police power which is deliberately shirking its duty to keep order so that they can suppress First Amendment rights. If there are no further questions, I'll sit down and answer whatever comes in rebuttal. Thank you, Your Honors. Thank you, Mr. Keller. Ms. McNeil. Thank you. My name is Erin McNeil, and I represent the Commonwealth Defendants at this stage. Lieutenant Krannis Curl is the only Commonwealth Defendant that has any claims that are up on appeal. And my colleague, Melissa York, will be addressing the rest of our brief. I'll be taking on the argument that this Court's holding in Turner v. Thomas and in Kessler v. City of Charlottesville are absolutely dispositive of how Balogh's appeal should be handled because both of those cases stand for the principle there is no constitutional right to police protection. Under Turner v. Thomas, that was a case brought under the Due Process Clause. This Court held that even though due process protects life, liberty, and property rights, even though the right to life and liberty and property are so fundamental, yet even under those circumstances and that line of cases from which Turner is the latest, there was no right to police protection. And certainly Pinder v. Johnson is a heartbreaking example of facts under which the police have no duty to safeguard a citizen's rights or life, liberty, or property no matter how much they are aware of the risk, no matter how much they could control that risk. There simply is no constitutional duty under the 14th Amendment. Kessler v. City of Charlottesville, an unpublished opinion that nevertheless, even though it's not binding, it certainly is persuasive because the reasoning is on all fours. The facts are the same, the law is the same, and the arguments are fundamentally the same. If anything, Mr. Balogh's arguments are a little weaker because he has no relationship with the state, whereas Mr. Kessler was the permit holder and argued for a special relationship that gave rise to a duty. Even so, this court held, and Chief Judge Diaz, you were on that panel, and your panel decision was correct. There is no right under the First Amendment either to police protection, safeguarding the right to speak from opposition. In this case, as in the trial court, the fact that they were mutual combatants is absolutely dispositive. I direct this court's attention to the fact that the facts, as characterized by Balogh, have changed from his opening brief to his rebuttal brief. Can you address that question? Why do you think that that's dispositive? I sort of took your argument to be it doesn't matter, right? Because the nature of the negative rights in the Constitution, it wouldn't matter if it was totally one-sided, right? There's no obligation on law enforcement to step in. I mean, I understand why that's sort of atmospherically interesting to you, but your legal argument doesn't seem to turn on that. Can you respond? Under the precedent of this circuit, there is not any guidance that suggests that we would uphold a heckler's veto. The closest case we have is the Rock of Life case. Is it UCMB? Rock of Life, UCMB. And Judge Nehemiah, you were on that panel, where this court held that a potentially divisive speaker, the school administrators couldn't segregate them into a less-trafficked part of campus in order to prevent violence. We do see that in the heckler's veto line of cases from outside this circuit, where peaceful speakers cannot be shut down, segregated, or censored in order to prevent violence when they are not themselves violent or a disruption to the peace. It's only the reaction to them as a disruption to the peace. And in the Kessler case, we all relied quite heavily on Bible believers out of the Sixth Circuit. And in the Sixth Circuit, that court held that because there were less invasive means or less intrusive means of safeguarding the public peace, such as a mere police presence to act as a deterrent, such as barricades or barriers that would prevent a hostile crowd from attacking a speaker, that complete dispersal of the speakers was excessive under the First Amendment. Can I follow up on Judge Richardson's question? And he can correct me if I'm wrong, but I thought he was indicating that if, in fact, the police do nothing, and they're not really, you know, affirming a heckler's veto, they're just doing nothing. And so query whether or not that's appropriate, given that, you know, they are, in fact, the police, and you would think that they would do something. But if they choose to do nothing, that seems to be OK under our case law. But if they choose to do something, they have to do it in a way that a peaceful speaker is not drowned out by a heckler. Is that fair? I think that's fair, that you would have to treat both the speaker and the counterprotesters equally, even when keeping the peace. And that's certainly true. I would push back against the characterization that the police didn't do anything because, again, the fact that we had uniformed police present, the fact that we did have barricades in an attempt to create safe spaces. Your argument is that they could understand. We're not talking about the facts, right? We're asking for your legal position is the police could have just not shown up at all. Correct. And there would be no sort of constitutional problem with that under the due process clause or the First Amendment. And that once the riot ensued, even if started solely by one side or the other, that at that point, as long as done equally, they could silence everybody. That's absolutely true. And if you look at the line of cases under unlawful assembly and talking about unlawful assemblies, you do have assemblies that become unlawful and the police disperse the entire crowd, including the combatants and the people that were there in a peaceful exercise of their rights. This court and other courts have upheld that after an unlawful assembly is declared, the police can just disperse an entire crowd in order to get the public safety under control and restore the street to safety and disperse everyone. And as long as it is a viewpoint neutral dispersal of all speakers, then that is constitutional. And I am out of time, Your Honor. I appreciate you. Thank you. Thank you. Ms. York. Thank you, Your Honor. May it please the court. Melissa York. I represent former Chief Al Thomas, but I am here today on behalf of the other appellees, which we believe only includes the city of Charlottesville at this time. Given the West Bellamy, there were no allegations against him raised on the briefing. I did want to be clear and start with the First Amendment does not protect violence. And the Supreme Court of the United States has said that where demonstrations turn violent, they lose their protected quality as expression under the First Amendment. And we had violence on August the 12th. Do you think your position is that's true, not talking about the facts of this case, but that's true if you had a purely peaceful protest, purely peaceful. Gandhi, for example, is sitting in a park, maybe not this park, and is attacked by a group of ne'er-do-wells. At that point, despite it being one-sided, there's no First Amendment violation when the police show up and clear everybody out, Gandhi included. I would push back on that, Your Honor. I think in that situation where you have one speaker who is obviously being peaceful and that person is being attacked, that there is some obligation to protect that speaker's rights. It's not a police protection. What right is that? Your colleague disagrees with you on that. But what is that right? Because if that's true, then we've got a factual question. That seems hard. So why is that? What is the right? Is that a First Amendment right? Gandhi, in my example, has a First Amendment right to protection? Well, I think your situation there is more akin to the Bible believers from the Sixth Circuit, in which there was a heckler's veto. You had peaceful speakers. They had objectionable speech. They were having things lobbed at them. And when the police showed up, the hecklers would stop. And the result or the determination of the police was to remove the speaker. And the Sixth Circuit said, no, that's a heckler's veto. You're effectuating a heckler's veto because there were other options available to you. And when you have one speaker and one attacker. That's because they didn't do it equally, right? So that's the scenario where in my hypothetical, Bible believers would be they take Gandhi away and they do something to Gandhi. But in my hypothetical, which is why I was asking it of you, is they take, they disperse everybody, right? Gandhi's got to go, but so too the ne'er-do-well. They could. You do not have a right to police protection of your First Amendment rights. And so you could, if deemed necessary, remove everyone from that situation. And it would not violate the First Amendment rights as long as you did remove everyone and didn't leave the hecklers and only removed the speaker. So the effect of that is that for any speaker, despite our use of this phrase heckler's veto, there actually is a heckler's veto if you're willing to engage in violence. So as long as the ne'er-do-wells in my hypothetical are willing to engage in violence, they can, in fact, silence any speaker. That's, in your view, that's wholly consistent with the First Amendment. I'm not disagreeing with you. That's not meant to be a hard question. No, I understand, Your Honor. And I would agree that the First Amendment does not protect violence. And when there is violence, we're not dealing with a heckler's veto where there's a threat of violence. When there's an actual situation with violence, the police can intervene and disperse everyone. Even if it's totally one-sided? Yes, Your Honor. But it's important to note here it was not one-sided. And I disagree with my colleague on the other side's recitation. But you agree it doesn't matter. It doesn't matter. There's this factual disagreement. And if the facts mattered, then we've got to talk about the facts. But I take your position to be the facts don't matter. The facts don't matter, Your Honor. But I just, for the record, I want to make sure that the Court understands there are a multitude of instances within the HEFI report where mutual combat is noted. At JA-233, 10 a.m., there's a fight between counter-protesters and UTR demonstrators. JA-234, 1021 a.m. Do you know, based on that fact, who started that fight? We don't know who started that fight. But, for example, at 2- I don't know either. But the challenge I've got, I'm happy for you to read through these. I've read it. I'm not sure to Rule 12 stage that we could determine that it's one side or the other. It is true there are fights, but most fights begin with somebody. Yes. Right? We don't often have fights that begin simultaneously with both sides. And so the challenge with the report, as I take it, is it doesn't answer the question of who started the fight. Correct, Your Honor. I did want to bring up one situation in which we do know that UTR demonstrators use shields, flags, or fists to start skirmishes that were eventually broken up by pepper spray, and that was at 10-57. It can be found at JA-239. The point is we knew that UTR supporters were coming with bats, batons, flagsticks, knives, and firearms to confront their political opponents. So they were coming armed. They were not coming to peacefully demonstrate like those in Bible Believers with their signs and their messages. They were coming armed for battle. The ruling of this court in Kessler and in Turner v. Thomas found qualified immunity. Can I ask about this? If they had not come armed for battle but were merely defending themselves, would the result be any different? It would not, Your Honor, because the First Amendment doesn't protect violence. And this was a riot. That's what it was. And I understand that Mr. Balow suggests that there was a plan to let this happen, and there's simply no support for that. The HEFE report outlines the efforts. Your point is it doesn't matter if it was. It doesn't matter. They could have sat down and come up with the very plan alleged, right? We're going to do nothing. We're going to let the fight start. But once the violence starts, we're going to disperse. And that maybe is not laudable, as our last case, maybe not moral, but it wouldn't violate the First Amendment. Correct, Your Honor. There's no constitutional duty to affirmatively protect your First Amendment rights. And the police could have shown up. Not at all. So the fact that they were there and didn't intervene to the extent that the appellant would have liked them to do is of no consequence. There's no violation. So we have here not only no constitutional right, so no constitutional violation, but it certainly wasn't clearly established at the time of August 12, 2017, that any decision not to intervene in violence would violate a constitutional right. So for that reason, the district court's decision that Chief Thomas and Lieutenant Kranitz-Curl were entitled to qualified immunity should be affirmed. Additionally, the district court found that the complaint did not plausibly allege a Monell claim. And as you're aware, that also has two elements. And since there's no constitutional duty, there could be no constitutional violation. But moreover, there was no plausible allegation in the complaint, even combined with the Heafey report, that there was either a policy of the city or a decision by a final policymaker. The complaint alleged that Chief Thomas was the final policymaker on August 12. But when you determine who's a final policymaker, you look to state law. And under the city charter, the city manager, Maurice Jones, at the time, was the final policymaker. And Maurice Jones is not alleged to have made any decision on August 12. At best, through a reasonable inference, you could infer that Mr. Jones overheard statements made by Chief Thomas. But again, overhearing a statement by a subordinate is neither delegation of authority nor ratification. So the Monell claim would fail for that reason as well. Other issues were raised on the briefing, Your Honors, on the heckler's veto and equal protection. The analysis with respect to qualified immunity in the Monell claim applies equally as to those. So unless Your Honors have further questions, I would cede the rest of my time and rely on our briefing. All right. Thank you, Mr. York. Mr. Kelly. First, I need to correct a misstatement in the record that my colleague made there on the other side. She pointed to the point where the Traditional Workers Party and the League of the South engaged with anti-vicariate protesters and said, well, they clearly started the fight. Judge Moon made much of this too. And the citation should be to note 324 and the video footage therein. We actually have it wrong in our brief, and I want to correct that. It's cited erroneously as 234. It's not. It's 324. And it does not show who does start the fight there. What it shows instead is the UTR protesters marching up fairly peacefully but with shields in hand. And they're being courted off. They're met at the entrance of the park by some nice-looking guys in the front with polo shirts on. And then behind them, a bunch of anarchists with fascist scum and tattoos and flagpoles of their own. The video footage doesn't actually show who starts the fight. But what it does clearly show is that the governmental authorities there had relinquished their duty and responsibility not to allow a group of protesters to court them off the street and block a public entrance. Now, when that's the case, what do you expect Americans to do? If you expect Americans to sit back peacefully and be abused and be hit with cement cans and urine bombs and everything else, then what you want are a nation of spineless trolls. And that's not what you have. And that's not what you should be wanting. What you should be wanting and what you should be demanding and what you should be outraged about are the police standing down and letting all of this take place. So the record is not as they say. And even a case like Pinder is distinguishable. And I admit the facts of Pinder, the ultimate facts, the arson, the murder, are much, much worse than what happened to Mr. Balic here. Point conceded. But even Pinder doesn't stand for the position that no matter what the police do, they're never responsible for the actions of third parties and madmen. What if, in Pinder, the Cambridge police told Carolyn Pinder, you know what, you've got to get out of this police station. We can't go out there in the parking lot because we see Pittman out there with his bull torch and it's too dangerous for us. But you've got to go. Would they still have had any responsibility? If you assaulted Carolyn Pinder there in the park? The question of when the police are responsible for the vicious third-party acts of criminals and madmen turns on foreseeability and proximity. And it was perfectly foreseeable here and the danger here was perfectly proximate and palpable. Where did you get that standard? I thought there was no duty. I mean, you're suggesting a tort duty imposed on police. Pinder versus, it's a Pinder case. The site I have is at 1175. The court said itself, at some point on the spectrum between action and inaction, the state's conduct may implicate it in the harm caused, but no such point is reached here. That implies there is no categorical exception or categorical prohibition on imposing liability when the police stand by and do nothing. And again, if Pittman were out there, in the parking lot with his bull torch, could the police have avoided liability or would that case have come out differently? And frankly, to draw the analogy more closely, it would have to be even worse to avoid liability in the Pittman case. What if Pittman were friends with the Cambridge chief of police? What if there were some kind of connections between Pittman that showed they were going soft on him because of those connections? As there are in this case, also my colleagues say there's nothing indicating that Maurice Jones was involved, but that's wrong too. In fact, amongst the very cases, the very pages that should have been cited by judgment but weren't, you see Maurice Jones issuing a declaration of regional emergency at 1107 a.m. And he's also in the command center. So clearly there's no liability there as well. It's just we have to read the Heath report and take its facts seriously in bailout's favor to get there. Something that should be done, hasn't been done in the past. The panel seems to be letting slide this notion that there is no right to enforce First Amendment rights. But that's against prior statements of this court and it's against fundamental Supreme Court precedent. This court favorably cited Justice Black's assent in Finer in the U.S. v. Kinkadesis, Coquina case. And they quoted Justice Black saying before you could ever proceed against a speaker, I'd say against someone who wants to hear a speaker, you have to make all reasonable efforts to avoid doing so. That wasn't done here. And my colleague again misrepresented the fact saying they at least erected barricades. They did not erect barricades. They erected barricades only to keep themselves apart from the melee that was going to unfold on Market Street. The barricades were between the police and between the UTR and Antifa rioters. They weren't between, there were no barricades on the day in question keeping the UTR folks from the Antifa. Those that worked at the Klan rally, they were withdrawn for this. Again, why? Is that just boneheaded stupidity? Or on this case, in this procedural posture, should that be a fact drawn in my client's favor? I mentioned U.S. v. Coquinda. I'd also point again, and I'll quote for you, Cox v. Louisiana. Government, governmental authorities have the duty and responsibility to keep the streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off the street or entrance to a public or private building and allow no one to pass who did not agree to listen to their exhortations. Cox at 554, 555. Now, much worse was insisted upon for the Antifa's criminals here, and it was given to them. Justice Clark dissenting in Edwards v. South Carolina, the power and duty of the state, the power and duty of the state to take adequate steps to preserve peace and to protect the privacy of the lives and the property of its residents cannot be doubted. And then, of course, Justice Black's dissent at U.S. v. Coquinda at 705, which was quoted by the majority of this circuit. So this is just a misstatement of law compounded by misstatements of fact. When the law is correctly applied, when the facts are correctly noted, this case should come out only one way, and that is back to the district court. Thank you, your honors. Thank you, Mr. Kelly. Thank you, all counsel for their arguments. It's just afternoon, yeah, 1240. We'll come down to Greek Council and adjourn for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court. Thank you.
judges: Albert Diaz, Paul V. Niemeyer, Julius N. Richardson